**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION**

**CRIMINAL ACTION NO. 4:05CR-43-M**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**VS.**

**BRENT FELIX BLOOMER
BELINDA K. STROBEL**                                            **DEFENDANTS**

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter is before the Court on a motion by Defendants, Brent Bloomer and Belinda Strobel, to suppress all physical and testimonial evidence obtained as a result of the search of their residence [DN 48, DN 49]. On May 2, 2006, a suppression hearing was held. There appeared Robert J. Kilmartin for the United States; Patrick J. Bouldin, counsel for Defendant, Brent Bloomer; and James A. Earhart, counsel for Defendant, Belinda Strobel. Fully briefed, this matter is ripe for decision.

**Background**

On July 12, 2005, Kentucky State Police Detectives Matt Conley, Ken Carter, and Louis Weber, along with Detective Mike Pearre of the Daviess County Sheriff's Department, went to the residence of Belinda Strobel located in Philpot, Kentucky, to conduct a "knock and talk"[1] after receiving complaints about heavy traffic volume and a strong chemical smell

---

[1] Federal courts have recognized "knock and talk" consensual encounters "as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation." United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005); United States v.

1

coming from the property. The Kentucky State Police did not have a search warrant or any arrest warrants. Strobel answered the door and according to Detective Conley, gave the officers permission to "look around the property" after verifying that she lived there with her boyfriend, Brent Bloomer. According to both Detective Conley and Detective Weber, Strobel requested to accompany the officers as they looked around her property.

Detectives Conley and Weber testified that when the officers approached the barn on the property, it was locked with a loose chain and lock. Detective Conley asked Strobel for the key to the barn and she informed him that Bloomer had the key. Detective Conley testified that he asked Strobel for permission to enter the barn and Strobel responded "if you can fit through the crack of the doors, you can." (Affidavit for Search Warrant at 3, Defendant's Exhibit 1). Once inside the barn, Detective Conley noticed a locked room. Near the room, the officer encountered a chemical smell common to the manufacture of methamphetamine. Strobel informed Detective Conley that Bloomer also had the keys to the room inside the barn. After exiting the barn, Detective Conley went to a large concrete silo located on the property. From the outside of the silo, Detective Conley stated that he observed multiple starting fluid cans with holes punched in the cans, as well as stripped batteries, cans of naptha, and Coleman fuel. (Uniform Offense Report, Defendant Exhibit 3; Affidavit for Search Warrant at 3, Defendant Exhibit 1). Detective Conley testified that

---

Chambers, 395 F.3d 563 (6th Cir. 2005)("Courts generally have upheld this investigative procedure as a legitimate effort to obtain a suspect's consent to search." Id. at 568 n. 2)). The Defendants have not challenged the use of the "knock and talk" in the present case.

Strobel informed the officers that Bloomer was on his way and if they would wait, he would have a key to the locked room inside the barn. Detective Conley stated at both the evidentiary hearing and in his report, that he contacted the Commonwealth Attorney's office and was advised that there was enough information to receive a search warrant.

Defendant Bloomer arrived at the residence, confirmed he had a key to the barn, and gave Detective Conley permission to use the key to look inside the room. However, Strobel stated that she should call her attorney first. According to Detective Conley's affidavit, "at that point he decided not to conduct a consent search of the room but rather pursue a search warrant." (Affidavit for Search Warrant at 3, Defendant Exhibit 1). At that time, the Kentucky State Police ceased searching, secured both the premises and the Defendants, and Detective Conley left to obtain a search warrant.

A search warrant was issued at 1:15 p.m. Detective Conley testified that after the warrant was issued, he proceeded to the residence and read the search warrant to both Defendants. Upon execution of the search, the Kentucky State Police found methamphetamine, pseudophedrine powder, other materials used in methamphetamine production, a 9 mm pistol and ammunition, and a sawed-off shotgun. Bloomer was subsequently arrested and taken to jail. At the jail, Detective Conley testified that he advised Bloomer of his Miranda rights, Bloomer signed a waiver of rights form, and then made incriminating statements. Three days later Strobel likewise was advised of her Miranda rights, signed a wavier of rights form, and made incriminating statements. Strobel's statement to law enforcement was recorded.

Defendants filed motions to suppress all testimonial and physical evidence. Defendants argue that Strobel did not consent to law enforcement searching her property and as a result, the information gleaned from the initial search should be stricken from the affidavit. Defendants contend that the remaining language would not be sufficient to support probable cause to search the property. In the alternative, Defendants argue that after Strobel revoked her consent to search, the officers continued to search her property without a search warrant. Further, Defendant Bloomer maintains that the 9 mm pistol should be suppressed because it was obtained directly from his unmirandized statement. Finally, Defendants argue that all the statements made to the officers after their arrest were not voluntarily made.

## Discussion

### A. Consent to Search

The Fourth Amendment prohibits searches without a warrant except in limited circumstances, such as when the search is conducted with consent. According to the United States Supreme Court, "[t]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." Georgia v. Randolph, 126 S.Ct. 1515, 1518 (2006).

In order to justify a search by consent, "the government must prove by 'clear and positive testimony' that the asserted consent was 'voluntary' and 'unequivocally, specifically, and intelligently given.'" United States v. Buckingham, 433 F.3d 508, 514 (6th

Cir. 2006)(quoting United States v. Worley, 193 F.3d 380, 385-86 (6th Cir.1999) ). "The question of whether a consent to search is voluntary and knowing is a question of fact to be determined from the totality of all the circumstances." United States v. Abdullah, 162 F.3d 897, 902 (6th Cir.1998).

> To evaluate the totality of the circumstances, the Court should consider several factors such as "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." United States v. Ivy, 165 F.3d 397, 402 (6th Cir.1998). In addition, the Court "should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, and indications of 'more subtle forms of coercion that might flaw [an individual's] judgment.' " Id. (quoting United States v. Watson, 423 U.S. 411, 424 (1976)) (citation omitted). No single factor is dispositive of the analysis. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

United States v. Bradley, 163 Fed. Appx. 353, 356 (6th Cir. 2005), cert. denied, 2006 WL 790024 (2006). Finally, voluntary and knowing consent does not require that a defendant be advised that she is entitled to refuse consent. United States v. Drayton, 536 U.S. 194, 206 (2002).

During the suppression hearing, the witnesses presented contradictory testimony on the issue of whether Strobel gave the officers consent to search her property. Kentucky State Police Detective Matt Conley testified that he went to the entrance of Strobel's residence, knocked on the door, waited for her to respond, identified himself when Strobel appeared at the door, explained that law enforcement had received complaints regarding high traffic volume and a strong chemical smell, asked Strobel if she would mind if he and the other officers looked around the property, and Strobel answered "sure" and requested to

5

accompany the officers. Detective Conley further stated that when he learned that Strobel did not have a key to the barn, he requested to enter the barn and take a look around. Detective Conley testified that Strobel consented saying, "if you can fit through the crack of the doors, you can." Kentucky State Police Detective Louis Weber confirmed the testimony of Detective Conley.

In contrast, Strobel testified that when asked by Detective Conley if the officers could look around the property, she instructed them that they could "walk the perimeter of the property." Furthermore, Strobel testified that Detective Conley was already half-way through the opening in the barn before he requested to enter the barn. As a result, Defendants argue that the scope of the consent was limited to "walking the perimeter of the property" and did not include the search of the barn or the silo.

When presented with contradictory testimony, this Court must weigh the evidence and make a credibility determination. After reviewing the testimony at the hearing and the demeanor of the witnesses, the Court finds that the officers' recollection of the consent to search more credible than Strobel's account. The Court finds no reason to question the testimony of Detective Conley who testified that when he asked Strobel if the officers could look around the property, she responded "sure." Further, Detective Weber confirmed that Detective Conley knocked on Strobel's door, identified himself, explained why the officers were there, and requested to look around the property. Additionally, both officers testified that prior to entering the barn, Detective Conley requested permission to enter the barn. Crediting the testimony of the law enforcement officers, the Court finds that the law

enforcement officers obtained the consent of Strobel to search her property, including the barn. Additionally, the Court finds that a typical reasonable person would have understood from the exchange between Detective Conley and Strobel that Strobel consented to the search of her property. Bradley, 163 Fed. Appx. at 356.

Moreover, the record suggests that Strobel's consent was free and voluntary. The officers did not use coercive tactics, and Strobel was not detained when she gave her consent. In fact, she requested to accompany the officers. Having observed Strobel testify, there is no indication that Strobel was below average in intelligence. Additionally, crediting the officers testimony, the Court finds that Strobel was not impaired at the time she gave the officers consent to search the property.

For these reasons, the Court finds that the initial search of the premises was conducted pursuant to a valid consent search. As a result, any evidence that law enforcement observed while conducting the consent search was properly included in the search warrant affidavit.

### B. Warrantless Search

Detective Conley testified that while he was searching the premises, Strobel informed him that Brent Bloomer was on his way to the residence and he had a key to the locked room inside the barn. Detective Conley further testified that when Bloomer arrived at the property, he confirmed that he had a key to the locked room and gave Detective Conley permission to search the locked room. However, at that time, Strobel stated that she should call her attorney first. Strobel's cell phone records indicate that she placed a telephone call at 11:20 a.m. to Allen Holbrook, an attorney who was representing her in her divorce.

According to the search warrant affidavit, "at that point [Detective Conley] decided not to conduct a consent search of the room but rather pursue a search warrant." (Conley Affidavit at 3, Exhibit 1.) At the evidentiary hearing, Detective Conley testified that prior to Bloomer's arrival at the residence, Conley had already called Assistant Commonwealth Attorney Mike VanMeter and was advised that there was enough evidence to receive a search warrant. (See also Uniform Offense Report, 16-05-802-4,Exhibit 3.)

It is well-settled that "'the consenting party . . . at any moment may retract [her] consent.'" United States v. Buckingham, 433 F.3d 508, 513 (6th Cir. 2006)(quoting Painter v. Robertson, 185 F.3d 557, 567 (6th Cir.1999)). The Court finds that Strobel withdrew her consent to search when she stated that she should call her attorney prior to law enforcement searching the locked room in the barn. Therefore, the question before the Court is whether the officers continued to search the premises without a valid search warrant after Strobel withdrew her consent to search.

Defendants allege that the seizure of all the evidence occurred after Strobel stated that she should call her attorney and prior to Detective Conley obtaining the search warrant in question in violation of the Fourth Amendment. Defendants argue that documents entitled "Evidence/Recovered Property" reflect that the items in question were recovered at 12:45 p.m., thirty minutes prior to Detective Conley obtaining the search warrant. Strobel testified at the hearing that the officers did not cease searching the premises, but continued to search the premises, including the residence, until her attorney returned her phone call at 2:46 p.m. In contrast, Detective Conley represented that at or before 11:27 a.m., law enforcement

8

discontinued the consent search, secured the premises, and he left to obtain a search warrant. Detective Conley and Detective Weber testified that the officers did not resume the search until Detective Conley returned with the search warrant.

Considering the testimony at the hearing and the demeanor of the witnesses, the Court finds that the officers' recollection of the search more credible than Strobel's account. The Uniform Citation and Uniform Offense Reports indicate that Detective Conley arrived at 11:00 a.m., left the property at 11:27 a.m., met with Judge Payne at 1:00 p.m., obtained the search warrant at 1:15 p.m., arrived back at the residence, read the search warrant to both Defendants, and arrested Bloomer at approximately 2:10 p.m. on July 12, 2005. The Court finds the listing of 12:45 p.m. as the time of Detective Conley's return to the home and the time of recovery of the seized property to be a mistake. Based on all the other evidence, the return time was more likely 1:45 p.m.

The Court also finds that Strobel did not have a good recollection of the events or the time-frame related to the search. For example, Strobel testified at the evidentiary hearing that Detective Conley did not leave the property to obtain a search warrant until she spoke with her attorney, Allen Holbrook, at 2:46 p.m. Specifically, Strobel testified that while she was on the phone with Mr. Holbrook, she handed her cell phone to Detective Conley and Mr. Holbrook instructed him to leave the premises and get a search warrant. Contrary to Strobel's testimony, Mr. Holbrook testified that he did not speak to any officers regarding the search in question. Additionally, the record clearly reflects that the search warrant was issued at 1:15 p.m., an hour and a half before Strobel spoke with Mr. Holbrook.

Furthermore, relying on one of the Uniform Offense Reports prepared in this case, Defendants argue that some of the evidence in question was actually seized from the property on July 11, 2005. (Exhibit 2.) Detective Conley testified that while he did attempt to "knock and talk" at the property on July 11, 2005, no one was home at the time. Detective Conley testified that the property was not searched at that time. Once again, the Court finds that the day and date reflected on that Uniform Offense Report is an error by Detective Conley. A review of the Uniform Offense Report in question indicates that the evidence was seized pursuant to a search warrant. It is undisputed that the search warrant in this case was issued on July 12, 2005 at 1:15 p.m. Additionally, Detective Weber is listed as a witness on the Uniform Offense Report. Detective Weber clearly testified that he was not on the premises in question on July 11, 2005.

Given the evidence discussed above, the Court finds that law enforcement properly secured the property to prevent the destruction of relevant evidence and did not resume the search until after Detective Conley returned to the premises. See United States v. Dorsey, 2005 WL 3307317, *2 (N.D. Ohio December 6, 2005) (quoting Dixon v. Wallowa County, 336 F.3d 1013, 1018 (9th Cir. 2003)). Therefore, the evidence in question was seized pursuant to a properly obtained search warrant.

### C. 9 mm Pistol

"Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." United States v. Cole, 315 F.3d

633, 636 (6th Cir. 2003)(citing Miranda v. Arizona, 384 U.S. 436, 478-79 (1966)).

Detective Conley testified that while searching the residence he located ammunition to a handgun. Detective Conley stated that he asked Bloomer where the gun was and was told it was in the filing cabinet in the barn. Detective Weber testified that he received information that there was a handgun in the stripping room in a filing cabinet underneath some rubber mudflaps after he had completed the search of the barn and the processing of the chemicals located in the stripping room in the barn. Detective Weber then searched the filing cabinet and found the loaded 9 mm pistol.

Bloomer argues that the 9 mm pistol should be suppressed given that it was discovered as a result of his interrogation in violation of Miranda v. Arizona. Bloomer further argues that because the officers had completed the search of the barn, the 9 mm pistol would not have been discovered during the search thereby barring the use of the inevitable discovery doctrine to prevent suppression of the pistol.

Interrogation is defined as "'words or actions on the part of police officers that they should [know are] reasonably likely to elicit an incriminating response.'" Cole, 315 F.3d at 636. At the time of Bloomer's statement regarding the location of the 9 mm pistol, Bloomer was in custody, Bloomer had not been advised of his rights, and his admission was in response to Detective Conley's direct question about the location of the gun that used the ammunition in question. See id. Because the Court believes that Conley's question constituted an interrogation and because Bloomer was clearly in custody, the Court concludes that this statement was obtained in violation of Miranda and the unmirandized statement

11

should be suppressed.

However, contrary to the argument of counsel, the Fourth Amendment does not require suppression of physical evidence discovered as a result of unmirandized but voluntary statements. United States v. Patane, 542 U.S. 630, 639 (2004)(holding failure to mirandize does not require the suppression of reliable, nontestimonial physical evidence derived from the suspect's voluntary but unwarned statements); United States v. Bradley, 163 Fed.Appx. 353 (6th Cir. 2005) ([T]he "fruit of the poisonous tree" doctrine does not apply to physical evidence seized as a result of a Miranda violation. Id. at 357).[2] According to the United States Supreme Court, "police do not violate a suspect's constitutional rights . . . by negligent or even deliberate failures to provide the suspects with the full panoply of warnings prescribed by Miranda." Patane, 542 U.S. 630, 124 S.Ct. 2620, 2629 (2004). Rather, "[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." Id. "Accordingly, the failure to give a suspect Miranda warnings does not require suppression of the physical fruits of a suspect's statements unless those statements were involuntary and, therefore, themselves unconstitutional under the Fifth Amendment." United States v. Barnes, 2005 WL 1899502, *3 (E.D. Pa. August 8, 2005)(citing Patane, 124

---

[2] See also Ewing v. Ludwick, 134 Fed. Appx. 907, 911 n.6 (6th Cir.2005); Binh Ky v. Yarbrough, 2006 WL 657119, *4 (E.D. Cal.) (March 15, 2006) ("Even if petitioner's statement was obtained in violation of Miranda, neither the briefcase nor its contents could have been excluded from evidence on the theory that they were the tainted fruit of the Miranda violation. There is no evidence before this court ... that [petitioner] was coerced into admitting that he owned the briefcase. Rather, petitioner voluntarily answered the officer's question regarding ownership of the briefcase."); United States v. Latz, 162 Fed. Appx. 113 (3d Cir. December 27, 2005).

S.Ct. at 2626-28)(Even though defendant's statement that he had a gun and some product in a safe was obtained in violation of <u>Miranda</u>, the district court relying on <u>Patane</u> held that the evidence seized from the safe was admissible at trial).

     To determine whether Bloomer's unmirandized statements were involuntary, the Court must consider the totality of the circumstances. The critical inquiry is whether the defendant's will was overborne. See <u>United States v. Reynolds</u>, 334 F. Supp.2d 909, 912 (W.D. Va. 2004); <u>Barnes</u>, 2005 WL 1899502, *1 (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986)). Bloomer does not argue that his statements were involuntary, as opposed to merely unmirandized. See <u>Latz</u>, 162 Fed. Appx. at 118. There is no evidence before this Court that Bloomer was coerced into admitting that the 9 mm pistol was in the barn. Rather, the petitioner voluntarily answered the officer's question regarding the location of the firearm. Nothing in the record suggests that Bloomer's "will was overborne" and, as a result, the failure to advise Bloomer of his <u>Miranda</u> rights does not require exclusion of the 9 mm pistol under <u>Patane</u>. For these reasons, the Court finds that Bloomer's Motion to Suppress his unmirandized statement related to the 9 mm pistol is granted and Bloomer's motion to suppress the 9 mm pistol is denied.

### D. Statements

In their motions to suppress, Defendants request the Court to suppress any statements, admissions and confessions. Defendants argue that their statements were made in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and were not made voluntarily. Having previously addressed Bloomer's statement regarding the 9 mm pistol, the Court will address

13

the remaining statements made by the Defendants at the jail.

First, Defendants argue in their brief that their post-arrest statements were obtained in violation of Miranda v. Arizona. The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The United States may not, therefore, use statements stemming from custodial interrogation of the Defendants without first demonstrating the use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). Detective Conley presented uncontradicted testimony that both Defendants were given their Miranda warnings prior to being questioned and that both Defendants signed the waiver of rights forms. (See also Defendant's Exhibit 7, Government Exhibit 1.) The Court credits Detective Conley's testimony and finds that the Defendants were given their Miranda warnings prior to any interrogation.

Second, both Defendants argue that their statements were not voluntary. In order for a confession to be admissible, it "'must be free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" United States v. Bishop, 149 F.3d 1185, 1998 WL 385898, *3 (6th Cir. July 1, 1998)(quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)); see also Colorado v. Connelly, 479 U.S. 157, 167 (1986). When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary. United States v. Wrice, 954 F.2d 406, 410 (6th Cir.), cert. denied, 504 U.S. 945 (1992). See

also <u>United States v. Mahan</u>, 190 F.3d 416, 423 (6th Cir. 1999). The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." <u>Mahan</u>, 190 F.3d at 423 (citing <u>McCall v. Dutton</u>, 863 F.2d 454, 459 (6th Cir.1988), <u>cert. denied</u>, 490 U.S. 1020 (1989)).

There is no evidence in the record indicating that the police activity was objectively coercive. The record reflects that on July 12, 2005, after arriving at the jail, Bloomer was given <u>Miranda</u> warnings, signed a waiver of rights form, and then made a statement to Detective Conley and Detective Ken Carter. Similarly, the record indicates that on July 15, 2005, Strobel was given <u>Miranda</u> warnings, signed a waiver of rights form, and then made a statement to Detective Conley. Additionally, the Court has reviewed a transcript of Strobel's recorded statement. The transcript reflects that no threats or promises were made, that Strobel was not deprived of any physical necessities, and that the interrogation was not particularly lengthy in duration. Furthermore, contrary to the argument of counsel, there is no evidence that the officers knew that Allen Holbrook represented Strobel in a civil matter or, for that matter, that she had actually called Mr. Holbrook on the date of the search. In fact, Mr. Holbrook confirmed that he did not speak directly to law enforcement the afternoon of the search. As a result, the Court concludes by a preponderance of the evidence that the Defendants' statements were voluntary.

For the reasons set forth above, the Court finds that both Bloomer and Strobel received <u>Miranda</u> warnings and voluntarily waived their rights.

### Conclusion

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motions by Defendants to suppress the physical and testimonial evidence [DN 48, DN 49] are **granted in part and denied in part.** The motion by Bloomer to suppress his statement made to Detective Conley regarding the location of the 9 mm pistol is **granted**. The motions by Defendants to suppress all physical evidence and all other testimonial evidence are **denied**.

cc:  Counsel of Record
     US Marshall
     US Probation